UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOSE CHAVEZ                        §
                                  §
V.                                §   CAUSE NO. 3:18-cv-2013
                                  §
STANDARD INSURANCE COMPANY        §

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Jose Chavez [hereinafter "Chavez"], Plaintiff herein, and would respectfully show the Court the following:

### DEFENDANT

1.   Defendant Standard Insurance Company [hereinafter "Standard"] may be served with summons by serving its registered agent: CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

### SUMMARY OF CLAIM

2.   Chavez was an employee of Nix Door & Hardware Inc. [hereinafter "Nix"] for over 24 years.

3.   Chavez suffers from two disabling conditions that are the subject of this lawsuit.

4.   First, Chavez suffers from a staph infection in his right hand that spread to his wrist, causing extensive damage that necessitated removal of some of the bony structures and a partial fusion.

5.   Second, Chavez suffers from a massive injury to his right shoulder, involving rotator cuff tears in which the subscapularis and infraspinatus tendons were completely torn and not repairable

and his biceps tendon was ruptured, leaving so little function that he may need further extensive surgery and possibly a prosthetic shoulder.

6.   Nix established and maintained an employee welfare benefit that offered benefits for long-term disability [hereinafter "LTD"], funded by an group insurance policy issued by Standard.

7.   Standard paid Chavez monthly LTD benefits from September 3, 2016 through February 12, 2018.

8.   On February 12, 2018, Standard denied benefits from February 13, 2018 and on.

9.   Standard treated Chavez's oral request for review on February 28, 2018 as an administrative appeal, which Standard denied by letter dated "March 23, 2018," even though Standard mailed it in an envelope postage-metered with the date of "03/26/2018," only one day before Chavez was scheduled for surgery on his right shoulder.

10.   Standard's denial letter of "March 23, 2018" contends that Chavez's disabling conditions are "classified as Other Limited Conditions."

11.   On June 13, 2018, Chavez (through his attorney) submitted additional medical records to Standard that are now part of the administrative record.

12.   The additional medical records submitted to Standard on June 13, 2018, along with the previously-assembled contents of the administrative record, demonstrate that Mr. Chavez is disabled by the problems both with his right wrist and with his right shoulder,

and that Standard misapplied the "Other Limited Conditions" wording in the summary plan description [hereinafter "SPD"].

13.  Standard refused to consider the additional medical records submitted on June 13, 2018, thus waiving its right to do so.

14.  Standard continues to deny Chavez's claim for LTD benefits beyond February 12, 2018.

15.  Chavez's claim is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. [hereinafter "ERISA"].

16.  Standard has failed to substantially comply with the procedural requirements of ERISA, and those violations were both widespread and flagrant.

17.  Under the governing law, discussed below, Standard improperly denied Chavez's claim.

## FACTS

18.  As a matter of law, in an ERISA case, "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it."[1]

19.  The administrative record of Chavez's claim includes of a number of medical records that Chavez provided to Standard by letter dated June 13, 2018, more than 45 days prior to the filing

---

[1] Vega v. National Life Ins. Servs., Inc., 188 F.3d 287, 300 (5th Cir. 1999)(en banc).

of this lawsuit.

20.   The medical records that Chavez provided to Standard by letter dated June 13, 2018 were described in said letter in the form "Attachment #," and are described herein in that form as well for easy reference, but are not attached hereto.

21.   Said documents are listed below:

| Attachment | Description |
|---|---|
| 1 | Records from All Healthcare Medical Clinic for visits on May 31, June 1 and June 4, 2016. |
| 2 | Records from John Peter Smith Hospital for shoulder surgery on March 27, 2018 and follow-up visit on April 16, 2018. |

## A.   **Chavez's Relevant Job History**.

22.   Chavez worked for Nix Door & Hardware Inc. for over 24 years, beginning on October 29, 1991.

23.   Chavez's last day of full-time work before becoming disabled was June 3, 2016.

24.   As of June 3, 2016, Chavez worked as a door installer.

25.   In a review conducted by Standard's Vocational Case Manager on June 1, 2017, Chavez's occupational title was noted as "Carpenter."

26.   In a review conducted by Standard's Vocational Case Manager on June 1, 2017, Chavez's occupation was noted as having a "Medium strength rating."

27.   In a review conducted by Standard's Vocational Case Manager on June 1, 2017, the physical demands of an occupation having a "Medium" strength rating are summarized an involving the

ability to: "Exert force of 20-50 lbs. occasionally, 10-25 lbs. frequently, or up to 10 lbs. constantly."

B.  **Chavez's Relevant Medical History**.

28.  Chavez suffers from two disabling conditions: (1) a staph infection in his right hand that spread to his wrist, causing extensive damage that necessitated removal of some of the bony structures and a partial fusion, and (2) a massive injury to his right shoulder, involving rotator cuff tears in which the subscapularis and infraspinatus tendons were completely torn and not repairable and his biceps tendon was ruptured, leaving so little function that he may need further extensive surgery and possibly a prosthetic shoulder.

1.  **Staph Infection in Chavez's Right Hand, Spreading to Wrist, Resulting in Removal of Scaphoid Bone and Styloid Process and in Partial Fusion**.

29.  Before June 13, 2018, the administrative record already contained evidence of the staph infection in Chavez's right wrist, beginning when Chavez was admitted to Texas Heath Southwest on June 5, 2016.

30.  In a "General History and Physical" dated June 5, 2016, Savita Kurup, M.D. reported that Chavez "noticed swelling and redness of his right hand a week ago," and that he "[i]nitially thought it might be gout and was seen by a provider and given abx [antibiotics] and steroid shot."

31.  On June 13, 2018, Chavez (through his attorney) provided Standard with records from All Healthcare Medical Clinic for Chavez's visits on May 31, June 1 and June 4, 2016 (Attachment 1).

32. The records from All Healthcare Medical Clinic for Chavez's visits on May 31, June 1 and June 4, 2016 provide the context for the treatment of Chavez's right wrist on and after June 5, 2016.

33. On May 31, 2016, Chavez reported "[right] hand pain came on after drinking beer at home," and that he was "concerned of gout."

34. On May 31, 2016, physical examination revealed Chavez's right hand was warm to the touch and exhibited edema.

35. On May 31, 2016, Dr. Kurup's treatment plan included Indocin (a nonsteroidal anti-inflammatory drug, or NSAID) and prednisone (a corticosteroid).

36. On June 1, 2016, Chavez reported that his right hand was still painful.

37. On June 1, 2016, Dr. Kurup observed continued edema of Chavez's right hand.

38. An X-ray taken on June 1, 2016 revealed some swelling near the proximal interphalangeal joints of the index and middle fingers of Chavez's right hand, but no acute osseous lesion.

39. Blood was drawn from Chavez on June 1, 2016 for lab testing.

40. The uric acid test revealed lower than normal levels in Chavez's blood, hence negating the possibility of gout (a form of inflammatory arthritis).

41. A separate Boston Heart lab test also confirmed the low uric acid levels in Chavez's blood.

42.  On June 4, 2016, Chavez continued to report pain and swelling of his right hand to Dr. Kurup.

43.  On June 4, 2016, Chavez was given an injection of Rocephin (an antibiotic) and prescribed Levaquin (an oral antibiotic).

44.  Before June 13, 2018, the administrative record already contained documentation of the worsening of Chavez's condition after June 4, 2016.

45.  For example, Chavez was hospitalized at Texas Heath Southwest from June 5 to June 11, 2016.

46.  Surgery was performed on June 5, 2016 for a dorsal abscess of Chavez's right hand, involving a 3 cm. incision and drainage of about 5 cc. of fluid.

47.  The fluid drained from Chavez's right hand on June 5, 2016 was cultured and found to be positive for methicillin susceptible staphylococcus aureus ("MSSA") infection.

48.  The discharge diagnosis from Texas Heath Southwest on June 11, 2016 was cellulitis and abscess of Chavez's right hand.

49.  Chavez was discharged from Texas Heath Southwest on June 11, 2016 with a new prescription for Rocephin (an antibiotic by intravenous injection).

50.  Chavez was treated by Joshua Berg, M.D., an infectious disease specialist, on July 13, 2016.

51.  On July 13, 2016, Dr. Berg examined Chavez and noted "marked swelling of the dorsal aspect of the right hand/wrist."

52.  On July 13, 2016, Dr. Berg assessed Chavez as suffering

from cellulitis, now of his right upper extremity, and MSSA.

53. On July 13, 2016, Dr. Berg noted: "Given worsening clinical exam findings of the right hand/wrist, I contacted Dr. Lesley's office this AM for urgent follow-up with concerns for persistence of abscess."

54. Nathan Lesley, M.D. ordered X-rays of Chavez on July 13, 2016.

55. On July 13, 2016, Dr. Lesley assessed Chavez as suffering from "[s]ubacute osteomyelitis of the right hand."

56. On July 13, 2016, Dr. Lesley recommended "surgery which will consist of bone cortex, obtaining cultures, and irrigation/debridement."

57. Dr. Lesley first performed surgery on Chavez on July 14, 2016.

58. On July 14, 2016, Dr. Lesley made a 4 cm. incision on the dorsal aspect of Chavez's right hand.

59. On July 14, 2016, thick purulence from Chavez's right hand was identified, drained, and sent for cultures.

60. On July 14, 2016, Dr. Lesley extended the 4 cm. incision on the dorsal aspect of Chavez's right hand to the radiocarpal and midcarpal joints, within which more pus was found.

61. On July 14, 2016, Dr. Lesley noted that the articular cartilage of Chavez's right wrist displayed some thinning, though the articular cartilage was not completely eroded.

62. On July 14, 2016, Dr. Lesley removed questionable-appearing tissue from Chavez's right wrist.

63.  On July 14, 2016, Dr. Lesley's diagnosis was septic arthritis of Chavez's right wrist.

64.  The LabCorp report from the July 14, 2016 culture confirmed staphylococcus aureus infection, susceptible to treatment by various antibiotics other than clindamycin.

65.  Dr. Lesley again performed surgery on November 29, 2016, this time to remove the scaphoid bone from Chavez's right wrist, to remove the styloid process from the right radius, to remove a considerable amount of articular cartilage from the midcarpal joint, and to fuse the midcarpal joint with three screws and a bone graft.

66.  During a post-op visit with Dr. Lesley on December 7, 2016, Chavez complained of throbbing pain in his right wrist, aggravated by movement.

67.  On December 7, 2016, Dr. Lesley prescribed a removable "forearm based wrist splint" for Chavez.

68.  A CT scan of Chavez's right wrist on February 21, 2017 revealed that one screw head projected into the radiocarpal joint, and that bony union was absent between the triquetrum and lunate bones and between the capitate and hamate bones.

69.  Without bony union, applying a load to Chavez's right wrist became quite painful.

70.  Dr. Lesley again performed surgery on March 7, 2017, this time to remove the loose screw and the other two screws from Chavez's right wrist.

71.  On July 20, 2017, in a Standard "Medical Questionnaire"

form, Dr. Berg assessed Chavez as having "no good function" of his right hand.

**2.   Massive Injury to Chavez's Right Shoulder: Rotator Cuff Torn So Badly that Subscapularis and Infraspinatus Tendons Were Not Repairable; and Biceps Tendon Ruptured.**

72.   Before June 13, 2018, the administrative record already contained evidence of the rotator cuff tears in Chavez's right shoulder.

73.   On March 16, 2017, while on a ladder wearing his wrist splint, Chavez lost his grip, fell off, and landed on his right shoulder.

74.   An MRI on June 9, 2017 revealed full-thickness tears of the supraspinatus and infraspinatus tendons, and partial tearing of the subscapularis tendon, within Chavez's right rotator cuff.

75.   The MRI on June 9, 2017 further revealed partial tearing of Chavez's right biceps tendon.

76.   The MRI report dated June 9, 2017 indicated, however, that the "examination is extremely limited due to motion artifact."

77.   In particular, the MRI report dated June 9, 2017 noted: "The superior labrum cannot be evaluated due to the degree of motion artifact."

78.   By fax on February 28, 2018, Chavez provided Standard with a number of records from John Peter Smith Hospital.

79.   The John Peter Smith Hospital records that Chavez provided to Standard on February 28, 2018 revealed that Chavez was scheduled for rotator cuff surgery on March 27, 2018.

80.   Chavez also informed Standard by telephone on March 19,

2018 that he was scheduled for rotator cuff surgery on March 27, 2018.

81.  Standard incorrectly noted the date for Chavez's scheduled rotator cuff surgery as "4/27" instead of the correct date of March 27, 2018, which in Standard's shorthand would be "3/27."

82.  On June 13, 2018, Chavez (through his attorney) provided Standard with records from John Peter Smith Hospital for Chavez's surgery on March 27, 2018 and follow-up visit on April 16, 2018 (Attachment 2).

83.  The records from John Peter Smith Hospital for Chavez's surgery on March 27, 2018 and follow-up visit on April 16, 2018 provide the context for the treatment of Chavez's right shoulder after February 28, 2018.

84.  In an operative note for Chavez's surgery on March 27, 2018, Brian Webb, M.D. described the rotator cuff tears in Chavez's right shoulder as "massive" and the damage to his biceps tendon as a "rupture."

85.  Dr. Webb warned that the surgery on Chavez's right shoulder might not fix the rotator cuff tears and the damage to the biceps tendon, and that "a total shoulder replacement including a reverse arthroplasty" might become necessary.

86.  A reverse arthroplasty repositions the deltoid muscle to partially replace the function of the rotator cuff.

87.  On March 27, 2018, Dr. Webb observed that Chavez's biceps tendon was ruptured and retracted, with a "stump" that remained

attached to the superior labrum.

88.   The superior labrum was the area that the MRI report on June 9, 2017 noted "cannot be evaluated due to the degree of motion artifact."

89.   On March 27, 2018, the "stump" of Chavez's biceps tendon, and much of the rotator cuff damage, was arthroscopically photographed for retention in the record.

90.   On March 27, 2018, Dr. Webb observed that Chavez's subscapularis tendon was "torn, retracted, and not repairable."

91.   On March 27, 2018, Dr. Webb observed in Chavez's right shoulder that a "quite retracted massive tear supraspinatus and entire infraspinatus torn."

92.   On March 27, 2018, Dr. Webb used three SwiveLock anchors (one of which pulled out of the bone, necessitating use of a larger screw) in an attempt to position the rotator cuff in proper position.

93.   Dr. Webb's operative note for the surgery on Chavez's right shoulder on March 27, 2018 states: "Whether this heals or not only time is going to tell."

94.   Dr. Webb's operative note for the surgery on Chavez's right shoulder on March 27, 2018 states: "If this fails, he will need a reverse arthroplasty or a large hemiarthroplasty as there is no infraspinatus."

95.   A hemiarthroplasty is a surgical procedure that replaces the humeral head of the shoulder joint with a prosthesis.

96.   In a follow-up visit on April 16, 2018, Vicki Nicklas,

P.T. noted that Chavez presented with "decreased flexibility, decreased ROM [range of motion], strength deficits, and pain limiting function."

**PROCEDURAL HISTORY OF CHAVEZ'S LTD CLAIM**

**A.   Plan Terms.**

97.   The SPD concerning the LTD benefits available to Chavez consists of a Standard document entitled "Certificate and Summary Plan Description Group Long Term Disability Insurance" for policy 642704-B.

98.   The "Insuring Clause" of the SPD states that, for those who "become Disabled while insured under this Group Policy," Standard "will pay LTD benefits according to the terms of the Group Policy after we receive Proof of Loss" satisfactory to Standard.

99.   The SPD contains a "Schedule of Insurance" that extends eligibility for LTD benefits to age 65 for claimants under the age of 61.

100. The SPD states that, if a claim is denied, the claimant may request a review, and that the claimant "must request a review in writing within 180 days after receiving notice of the denial."

**1.   "Other Limited Conditions" Wording.**

101. The SPD contains a section entitled "Disabilities Subject to Limited Pay Periods" that limits to 12 months the payment of LTD benefits for "Other Limited Conditions."

102. The SPD states: "Other Limited Conditions means . . . arthritis, . . . and sprains or strains of joints or muscles."

2.   **Standard's Role as Plan Fiduciary**.

103. The SPD reveals that the Standard has the authority and duty "to administer claims."

104. The SPD contains a notice of rights and protections as required by ERISA, including a notice that the people wh operate the plan are "fiduciaries."

105. All funding of LTD benefits available to Chavez is provided by Standard under policy no. 642704-B.

106. Standard would retain for its own use any premiums received in excess of benefits paid to claimants under policy no. 642704-B.

107. In other words, Standard operates under a conflict of interest in administering claims for LTD benefits under policy no. 642704-B.

B.   **Chavez's LTD Claim**.

1.   **Initial Approval and Payment of Chavez's LTD Claim**.

108. Standard paid Chavez LTD benefits of $1,868.40 per month for the period beginning September 3, 2016.

109. On March 29, 2017, one of Standard's Nurse Case Managers acknowledged Chavez had a "history of joint infection osteomyelitis (infection in bone.)"

110. On March 29, 2017, one of Standard's Nurse Case Managers concluded: "Reasonable to accept L/Rs [limitations and restrictions] preventing consistent use of [right] hand/wrist from cease work & currently ongoing."

111. In a "Memo to File" dated June 29, 2017, Jennifer

Marshall [hereinafter "Marshall"] noted that Chavez "has undergone 4 hand surgeries which he reports has left his right hand non-functioning."

112. For at least the time period from June 29, 2017 through July 2, 2018, Marshall was an employee of Standard.

113. For at least the time period from September 4, 2015 through March 21, 2016, Marshall was an authorized representative of Standard with respect to Chavez's claim.

114. In a "Memo to File" dated June 29, 2017, Marshall noted that Chavez "ceased working due to right hand cellulitis, abcess and staph infection.

115. In a "Memo to File" dated June 29, 2017 concerning Chavez's claim, Marshall noted:

> Updated medical has been received which would support inability to perform his medium strength level occupation which is noted to be a carpenter, he is a door installer, and it is reasonable this occupation would require full functioning of his hand as well as significant overhead work.

## 2.   Report from Standard's Consultant, Dr. Mandiberg.

116. One of Standard's Case Managers completed a "Medical Referral" form on July 5, 2017.

117. The "Medical Referral" form dated July 5, 2017 asked: "What are the claimant's limitations and/or restrictions as of the most recent medical information and going forward?"

118. The "Medical Referral" form dated July 5, 2017 asked: "What are the claimant's limitations and/or restrictions as of the most recent medical information and going forward?"

119. The "Medical Referral" form dated July 5, 2017 asked:

If the claimant's medical condition identified is causing limitations and restrictions would the condition identified be considered:
. . .
o  arthritis
. . .
o  strain of joints or muscles

120. Standard's "Medical Referral" form dated July 5, 2017 was provided to its consultant, Joseph Mandiberg, M.D.

121. Dr. Mandiberg has worked as a consultant for Standard since 2006.

122. Dr. Mandiberg prepared a "Physician Consultant Memo" dated March 19, 2018.

123. The "Physician Consultant Memo" dated July 24, 2017 summarized a February 21, 2017 Medical Questionnaire as indicating Chavez "could use his right hand to lift, carry, and push or pull a maximum of 10 pounds occasionally."

124. A capacity to "lift, carry, and push or pull a maximum of 10 pounds occasionally" is below the "Medium" strength rating of Chavez's occupation.

125. The "Physician Consultant Memo" dated July 24, 2017 stated Dr. Mandiberg's opinion that the "limitations and restrictions delineated in the February 21, 2017, Medical Questionnaire may very well be permanent."

126. The "Physician Consultant Memo" dated July 24, 2017 stated Dr. Mandiberg's opinion that Chavez "is not capable of working above shoulder height with his right arm.

127. The "Physician Consultant Memo" dated July 24, 2017 stated Dr. Mandiberg's opinion: "Given the severity of rotator cuff

tears, I expect he will have permanent limitations in weight and ability to lift overhead."

128. The "Physician Consultant Memo" dated July 24, 2017 stated Dr. Mandiberg's opinion that Chavez's "right hand condition started out as an infection and eventually caused 'arthritis' of the wrist joint."

129. The "Physician Consultant Memo" dated July 24, 2017 stated Dr. Mandiberg's opinion that Chavez's "shoulder falls under 'sprain or strain of joints or muscles.'"

130. After Standard received Dr. Mandiberg's "Physician Consultant Memo" dated July 24, 2017, Standard continued to pay Chavez LTD benefits of $1,868.40 per month through February 12, 2018.

### 3. <u>Standard's Denial of Benefits Dated February 12, 2018</u>.

131. By letter dated February 12, 2018, Standard suddenly denied Chavez's claim.

132. Standard's denial letter dated February 12, 2018 was authored by Marshall.

133. In Standard's denial letter dated February 12, 2018, Marshall specifically mentioned that Chavez's "file was reviewed by a Physician Consultant."

134. In Standard's denial letter dated February 12, 2018, Marshall did not mention that the review of Chavez's file by a "Physician Consultant" had occurred over six months before the denial.

135. In Standard's denial letter dated February 12, 2018,

Marshall acknowledged that Standard's "Physician Consultant" had noted that Chavez's right hand/wrist condition "would most likely cause permanent limitations and restrictions."

136. In Standard's denial letter dated February 12, 2018, Marshall acknowledged that Standard's "Physician Consultant" had noted that Chavez's right shoulder rotator cuff tear "would also most likely cause permanent restrictions in [Chavez's] ability to lift and work overhead with [his] right arm."

137. Nevertheless, in Standard's denial letter dated February 12, 2018, Marshall stated: "Your hand condition is considered to be arthritis and your right shoulder rotator cuff tear is considered to be a sprain or strain of joints or muscle."

**4. <u>Standard's Denial of Benefits Dated "March 23, 2018"</u>.**

138. On February 28, 2018, Marshall noted from a telephone conference with Chavez that "he would like his claim reviewed."

139. On February 28, 2018, Marshall noted from a telephone conference with Chavez: "He explained he can't write."

140. On February 28, 2018, Marshall noted from a telephone conference with Chavez about Standard's "LTD decision" that: "He tells me he disagrees with it all.""

141. On February 28, 2018, Marshall noted from a telephone conference with Chavez: "He needs shoulder surgery which is scheduled for 3/26/18."

142. By letter dated "March 23, 2018", Standard noted that it treated Chavez's oral comments on February 28, 2018 as an administrative appeal, which Standard denied.

143. Standard's denial letter dated "March 23, 2018" was mailed in an envelope postage-metered with the date of "03/26/2018".

144. A true copy of Standard's envelope for its denial letter dated "March 23, 2018" is attached hereto.

145. The envelope for Standard's denial letter dated "March 23, 2018" was postage-metered on the very day Marshall had noted as the date Chavez was scheduled for surgery on his right shoulder.

146. The envelope for Standard's denial letter dated "March 23, 2018" was postage-metered on the day before the date Chavez was scheduled for surgery on his right shoulder, as shown in the hospital records Chavez faxed to Standard on February 28, 2018.

147. The envelope for Standard's denial letter dated "March 23, 2018" was postage-metered on the day before the date the surgery was actually performed on Chavez's right shoulder.

148. Standard's denial letter dated "March 23, 2018" was authored by Leo Suzuki [hereinafter "Suzuki"].

149. For at least the time period from March 5, 2018 through July 2, 2018, Suzuki was an employee of Standard.

150. For at least the time period from March 5, 2018 through July 2, 2018, Suzuki was an authorized representative of Standard with respect to Chavez's claim.

151. In Standard's letter dated "March 23, 2018", Standard specifically mentions that Chavez had stated to Standard that he "disagreed with the claim decision entirely," and that Standard interpreted Chavez's oral comments as "request[ing] a review of the

closure of [his] claim."

152. Standard's denial letter of "March 23, 2018" contends that Chavez's disabling conditions are "classified as Other Limited Conditions."

153. In Standard's letter dated "March 23, 2018", Standard specifically mentions that Chavez's "file was reviewed by a Physician Consultant."

154. As discussed below, Standard's denial involved a report from a consultant, Dr. Volk.

   **5.   Report from Standard's Consultant, Dr. Volk.**

155. Suzuki completed a "Medical Referral" form on March 8, 2018.

156. In the "Medical Referral" form dated March 8, 2018, Suzuki asked: "1. Please identify the claimant's diagnoses and discuss specific limitations and restrictions supported by the record after 9/2/17, if any."

157. In the "Medical Referral" form dated March 8, 2018, Suzuki asked: "2. Are any diagnoses identified in Question #1 considered: . . . arthritis, . . . and sprains or strains of joints or muscles?"

158. Standard's "Medical Referral" form dated March 8, 2018 was provided to its consultant, William Volk, M.D.

159. Dr. Volk has worked as a consultant for Standard since 2017.

160. Dr. Volk prepared a "Physician Consultant Memo" dated March 19, 2018.

161. In the "Opening Synopsis" section of the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk summarized that Chavez "ceased work on 6/3/16 due to right wrist infection."

162. The "Physician Consultant Memo" dated March 19, 2018 stated that Dr. Volk "will limit the below summary of the medical records pertaining to 9/2/17 and forward."

163. The "Physician Consultant Memo" dated March 19, 2018 included Dr. Volk's summary of the medical records for only seven dates, from September 26, 2017 through February 13, 2018.

164. The "Physician Consultant Memo" dated March 19, 2018 did not include any summary by Dr. Volk of Chavez's medical records from June 5, 2016 through September 25, 2017.

165. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 1 did not list or discuss any diagnosis of any problem with Chavez's right wrist.

166. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 1 listed only two diagnoses: (a) "Right hand stiffness after arthrodesis surgery" and (b) "Right shoulder rotator cuff tear."

167. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 1 stated that, with respect to "Right shoulder rotator cuff tear," the "records support ongoing limitations and restrictions from at least 9/2/17 and ongoing."

168. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 was "Yes.  Right shoulder rotator cuff tear falls under 'sprains or strains of joints or muscles'."

169. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss any problem with Chavez's right wrist.

170. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss the staph infection in Chavez's right wrist.

171. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss the septic arthritis of Chavez's right wrist.

172. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss the removal of  the scaphoid bone from Chavez's right wrist.

173. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss the removal of the styloid process from the right radius within Chavez's right wrist.

174. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss the removal of a considerable amount of articular cartilage from the midcarpal joint of Chavez's right wrist.

175. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss the fusion of the midcarpal joint within Chavez's right wrist with three screws and a bone graft.

176. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss the absence

of bony union between the triquetrum and lunate bones of Chavez's right wrist.

177. In the "Physician Consultant Memo" dated March 19, 2018, Dr. Volk's answer to Question 2 did not list or discuss the absence of bony union between the capitate and hamate bones of Chavez's right wrist.

### 6.   Chavez's Request that Standard Reconsider Its Denial.

178. On June 13, 2018, Chavez (through his attorney) asked Standard in a letter sent by telecopier to reconsider its denial of LTD benefits.

179. Pages 2-3 of Chavez's June 13, 2018 letter contained the following text:

> The Fifth Circuit, en banc, authorized claimants and their attorneys to submit additional evidence for reconsideration by a plan administrator, provided that the administrator is given a "fair opportunity" to consider same before suit is filed:

> > Before filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it.

> Vega v. National Life Ins. Servs., Inc., 188 F.3d 287, 300 (5th Cir. 1999)(en banc; emphasis added).

> > We hold today that the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it.

> Id. (emphasis added).

> > "If the claimant submits additional information to the administrator, however, and requests the administrator to reconsider his

> decision, that additional information should
> be treated as part of the administrative
> record."

Id. (emphasis added).

> The Fifth Circuit explained:  "Our motivating
> concern here is that our procedural rules encourage the
> parties to resolve their dispute at the administrator's
> level."  Id. (emphasis added).  The limitation of
> judicial review to the contents of the administrative
> record "encourages both parties properly to assemble the
> evidence that best supports their case at the
> administrator's level."  Id. at 298 (emphasis added).
> Standard thus now has a "fair opportunity" to reconsider
> its denial in light of the accompanying evidence.

> If Standard fails to reconsider its denial, after I
> have hereby placed Standard on notice of the governing
> law in this jurisdiction, it will waive its right to
> consider the additional evidence at a later time.  In an
> ERISA case, the question of waiver is a matter of
> federal common law, from at least the time of this
> Court's decision in Pitts v. American Sec. Life Ins. Co.,
> 931 F.2d 351, 357 (5th Cir. 1991).  The Court explained:
> "Strictly defined, waiver describes the act, or the
> consequences of the act, of one party only."  Id. at 357
> (emphasis deleted).  "Waiver is the voluntary or
> intentional relinquishment of a known right."  Id.
> (emphasis deleted).  Standard now knows of its right to
> reconsider its denial in light of the additional
> evidence.

180. With Chavez's letter to Standard dated June 13, 2018,

Chavez provided medical records described in said letter as

"Attachment 1" and "Attachment 2."

181. Chavez's letter to Standard dated June 13, 2018 stated

that he would "give Standard 45 days to act."

182. Chavez's letter to Standard dated June 13, 2018 stated:

> By regulation, 45 days is a fair opportunity to make a
> determination on an LTD claim under ERISA.  See 29 C.F.R.
> §§ 2560.503-1(f)(3), (i)(3)(i).  After that time has
> expired, Standard will waive its opportunity to
> administratively consider this submission.

183. Chavez's letter to Standard dated June 13, 2018 stated

that the "procedural rules 'encourage the parties to resolve their dispute at the administrator's level.'  <u>Vega</u>, 188 F.3d at 300."

184. In the letter to Standard dated June 13, 2018, Chavez "encourage[d] Standard to resolve this matter now rather than in litigation."

### 7.   **Standard's   Denial   of   Chavez's   Request   for Reconsideration**.

185. By letter dated July 2, 2018, Suzuki acknowledged that Standard had received Chavez's submission of June 13, 2018.

186. In Standard's letter dated July 2, 2018, Suzuki stated that Chavez "called on February 28, 2018 and requested a review" of Standard's decision to close his claim, "stating that he was physically unable to write."

187. In Standard's letter dated July 2, 2018, Suzuki stated that Standard "accepted [Chavez's] verbal request for review."

188. In Standard's letter dated July 2, 2018, Suzuki stated that Standard "conducted another review of [Chavez's] claim," as explained in its letter dated "March 23, 2018".

189. In Standard's letter dated July 2, 2018, Suzuki stated that Standard was "declining [Chavez's] request to undertake a second review."

190. In Standard's letter dated July 2, 2018, Suzuki stated that Standard "will not commence further review of the claim."

191. Before Chavez filed this lawsuit, he gave Standard more than the 45 days specified in 29 C.F.R. § 2560.503-1(f)(3) and 29 C.F.R. § 2560.503-1 (i)(3)(i) to consider his letter dated June 13, 2018, and to consider the medical records submitted with that

letter as <u>Attachment 1</u> and <u>Attachment 2</u>.

192. Chavez thus gave Standard a "fair opportunity" to consider his letter dated June 13, 2018, and to consider the medical records submitted with that letter as <u>Attachment 1</u> and <u>Attachment 2</u>, before filing this lawsuit.

193. Chavez's letter dated June 13, 2018, and the medical records submitted with that letter as <u>Attachment 1</u> and <u>Attachment 2</u>, satisfy the Fifth Circuit's criteria in <u>Vega</u>, as follows:

> Before filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it.

<u>Vega</u>, 188 F.3d at 300.

194. Chavez's letter dated June 13, 2018, and the medical records submitted with that letter as <u>Attachment 1</u> and <u>Attachment 2</u>, satisfy the Fifth Circuit's criteria in <u>Vega</u>, as follows:

> We hold today that the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it.

<u>Id</u>.

195. Chavez's letter dated June 13, 2018, and the medical records submitted with that letter as <u>Attachment 1</u> and <u>Attachment 2</u>, satisfy the Fifth Circuit's criteria in <u>Vega</u>, as follows:

> If the claimant submits additional information to the administrator, however, and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record.

<u>Id</u>.

196. Standard has waived its opportunity to administratively

consider Chavez's letter dated June 13, 2018, and the medical records submitted with that letter as <u>Attachment 1</u> and <u>Attachment 2</u>.

197. Because Standard has refused to resolve this dispute "at the administrator's level," <u>Vega</u>, 188 F.3d at 298, litigation has become necessary.

## STANDARD MISAPPLIED THE "OTHER LIMITED CONDITIONS" WORDING

198. Standard's denial letter of "March 23, 2018" contends that Chavez's disabling conditions are "classified as Other Limited Conditions." Standard's conclusion contradicts the governing law in this jurisdiction, as established by the Fifth Circuit in cases such as <u>Koehler v. Aetna Health, Inc.</u>, 683 F.3d 182 (5th Cir. 2012) and <u>Thomason v. Metropolitan Life Ins. Co.</u>, 703 Fed. Appx. 247 (5th Cir. 2017).[2]

**A.   The LTD Plan Must Be Interpreted in Accordance with Background Legal Rules Governing SPDs.**

**1.   Interpreting ERISA Plans in Accordance with Background Legal Rules, When Plan Does Not State Otherwise.**

199. A plan participant may bring a civil action to recover benefits due, or to enforce his rights, "under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). As the Supreme Court noted: "The provision allows a court to look outside the plan's written language in deciding what those terms are, <u>i.e.</u>, what the language means." <u>CIGNA Corp. v. Amara</u>, 563 U.S. 421, 436 (2011).

200. To decide what a plan agreement means, as the Supreme

---

[2]

The undersigned represented the claimants in <u>Koehler</u> and <u>Thomason</u>.

Court noted, "a court properly takes account of background legal rules—the doctrines that typically or traditionally have governed a given situation when no agreement states otherwise." U.S. Airways, Inc. v. McCutchen, 569 U.S. 88, 102 (2013). "Indeed, ignoring those rules is likely to frustrate the parties' intent and produce perverse consequences." Id.

201. In U.S. Airways, the Court held that a legal doctrine known as the common-fund rule "informs interpretation of U.S. Airways' reimbursement provision." Id. at 106. "In other words, if U.S. Airways wished to depart from the well-established common-fund rule, it had to draft its contract to say so—and here it did not." Id. at 101.

202. The "background legal rules" that are relevant to Chavez's claim, see U.S. Airways, 569 U.S. at 102, are those governing SPDs.

**2.    Background Legal Rules Governing SPDs.**

203. The interpretation of the SPD is informed by the "background legal rules" governing SPDs. See U.S. Airways, 569 U.S. at 102. Those rules include 29 U.S.C. § 1022(a) and a well-established body of related regulations and Fifth Circuit authority.

**a.    ERISA Statutory Requirements.**

204. ERISA requires that an SPD "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise [plan] participants and beneficiaries of their rights and

obligations under the plan." 29 U.S.C. § 1022(a)(emphasis added).
An SPD can violate the statute, therefore, by (1) what it says, if
that is not "accurate," or (2) what it does <u>not</u> say, if by that
omission it is not "comprehensive."

   b. **ERISA Regulatory Requirements**.

  205. The Secretary of Labor holds the statutory authority to
"prescribe such regulations as he finds necessary or appropriate to
carry out the provisions" of section 1022(a).  29 U.S.C. § 1135.
The ERISA regulations require that an SPD must include "a statement
<u>clearly identifying</u> circumstances which may result in . . . <u>loss,</u>
<u>forfeiture or suspension of any benefits</u> that a participant or
beneficiary might otherwise reasonably expect the plan to provide
on the basis of the description of benefits."  29 C.F.R. §
2520.102-3(l)(emphasis added).  The SPD "<u>must not have the effect</u>
<u>to misleading, misinforming or failing to inform participants and</u>
<u>beneficiaries</u>."  29 C.F.R § 2520.102-2(b)(emphasis added).  An SPD
can violate the regulations, therefore, by (1) what it says, if it
is "misleading" or "misinforming," or (2) what it does <u>not</u> say, if
it thereby fails to inform or clearly identify circumstances
resulting in loss or forfeiture of benefits.

   c. **The Hansen Decision**.

  206. As observed by the Fifth Circuit:

> The purpose of such a provision is obvious: "It is
> grossly unfair to . . . disqualify [an employee] from
> benefits if . . . [the] conditions [which lead to the
> disqualification] were stated in a misleading or
> incomprehensible manner in the plan booklets.

<u>Hansen v. Continental Ins. Co.</u>, 940 F.2d 971, 980 (5th Cir. 1991)

(ellipses and brackets in original).  To give effect to this statutory purpose, the Fifth Circuit held that "[any] ambiguity in the [SPD] must be resolved in favor of the employee and made binding against the drafter." Id. at 982.  (That legal doctrine is known as the rule of contra proferentem.)

207. The court explained: "Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting." Id. (emphasis added).  In contrast, individual employees are "powerless to affect the drafting of the summary . . . and ill equipped to bear the financial hardship that might result from a confusing or misleading document." Id.

208. The court reached its conclusion on the basis of the ERISA statute and legislative history, and on the basis of case law construing that statute, history and associated ERISA regulations. See id.  For example, the court relied on Edwards v. State Farm Mut. Auto. Ins. Co., 851 F.2d 134, 136 (6th Cir. 1988), which relied on Genter v. Acme Scale & Supply Co., 776 F.2d 1180, 1185 (3d Cir. 1985), which relied on Morse v. Stanley, 732 F.2d 1139, 1148 (2d Cir. 1984).  Morse, in turn, relied on the ERISA regulations discussed above, 29 C.F.R. § 2520.102-2(b) and 29 C.F.R. § 2520.102-3(l).

###         d.   **The Rhorer Decision**.

209. The rule of contra proferentem is not limited to circumstances in which the SPD creates a conflict with plan language; it also applies to ambiguities without a conflict. See Rhorer v. Raytheon Eng'rs & Constructors, Inc., 181 F.3d 634, 642

(5th Cir. 1999).  "[W]e reject Raytheon's argument that Hansen is only controlling in cases where there is a positive conflict between the [SPD] and the policy."  Id.

210. When "a reasonable plan participant could not read the [SPD] and know with any degree of certainty" the interpretation offered by the plan administrator, the SPD is ambiguous and must be resolved in the claimant's favor.  Rhorer, 181 F.3d at 642 (emphasis added).  Such uncertainty can arise from mere "conflicting inferences."  Rhorer, 181 F.3d at 642 (emphasis added).

> ### e.    **The Koehler Decision**.

211. The Fifth Circuit in Koehler specifically examined Hansen and Rhorer in light of the Supreme Court's subsequent decision in CIGNA, and noted that, under section 1132(a)(1)(B), courts could "look outside the plan's written language in deciding what those terms are, i.e., what the language means."  Koehler v. Aetna Health, Inc., 683 F.3d 182, 189 (5th Cir. 2012) (quoting CIGNA, 563 U.S. at 436).  The Fifth Circuit then held that "CIGNA does not disturb our prior holdings that (1) ambiguous plan language be given a meaning as close as possible to what is said in the plan summary, and (2) plan summaries be interpreted in light of applicable statutes and regulations."  Id. (emphasis added). "Those regulations require considerably greater clarity."  Id. (emphasis added, citing 29 C.F.R. § 2520.102-2(b) and 29 C.F.R. § 2520.102-3(l)).

212. In Koehler, Aetna contended that a "pre-authorization

requirement is unambiguously expressed." Id. at 187.  The court
noted that the wording of the SPD seemed to contemplate a request
for authorization at some point, but "it does not say when that
request must occur." Id. (emphasis added).  The Fifth Circuit
found that "the plan is ambiguous and the need for pre-
authorization was not clearly stated in [the SPD]." Id. at 184.
In other words, in the context of interpreting an SPD, the wording
was rendered ambiguous by what it did not say, or did not say
clearly.  The Fifth Circuit held that it "must resolve this
ambiguity against requiring pre-authorization of ad hoc outside
services." Id. at 189.

       **f.**   **The Thomason Decision**.

213.  "As we described at length in Koehler, '[a]mbiguities in
a plan summary are resolved in favor of the beneficiary'—even when
the [SPD] is a verbatim copy of the plan." Thomason v.
Metropolitan Life Ins. Co., 703 Fed. Appx. 247, 251 (5th Cir.
2017)(citation omitted).  "Although a plan may give a plan
administrator discretion over the plan, that discretion does not
extend to the [SPD]." Id. (citing Koehler).

214.  At issue in Thomason was whether Thomason had, under a
phrase in the SPD, "elect[ed] to receive" pension benefits rolled
over into an IRA.  "Because 'a reasonable plan participant could
not read the [SPD] and know with any degree of certainty,' which
'conflicting inference' should control, . . . the [SPD] is
ambiguous." Id. at 252 (citing Rhorer).  "Because this language is
ambiguous, . . . we interpret the provision contra proferentem and

construe the language against MetLife and in favor of Thomason."
Id. at 251. "In sum, the [SPD] gave no indication of whether a
direct rollover . . . constituted a beneficiary 'electing to
receive' pension benefits." Id. at 252. "Accordingly, we
determine that Thomason had not elected to receive the funds." Id.

**B.   Chavez's Wrist and Shoulder Problems Are Not "Other Limited
       Conditions."**

> **1.   Staph Infection in Hand, Spreading to Wrist, Resulting in
>         Removal of Scaphoid Bone and Styloid Process and in
>         Partial Fusion, Is Not "Arthritis."**

215. The use of "arthritis" in the definition of "Other
Limited Conditions" in the SPD does not include the problems with
Chavez's right wrist, as discussed below.

216. A "reasonable plan participant" would understand
"arthritis" to mean only the common condition that develops over
years of slow joint deterioration, medically described as
"osteoarthritis." A "reasonable plan participant" would not
understand "arthritis" to mean a staph infection, or osteomyelitis,
or the uncommon and quickly-developing "septic arthritis" from
which Chavez suffered. A "reasonable plan participant" would not
understand "arthritis" to mean the removal of the scaphoid bone and
styloid process from the wrist, or the partial fusion of the wrist.

217. The interpretation offered by Standard violates the
requirements that the SPD (1) must include "a statement clearly
identifying circumstances which may result in . . . loss,
forfeiture or suspension of any benefits that a participant or
beneficiary might otherwise reasonably expect the plan to provide
on the basis of the description of benefits," 29 C.F.R. § 2520.102-

3(1)(emphasis added), and (2) "<u>must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries</u>," 29 C.F.R § 2520.102-2(b)(emphasis added).

218. Because "a reasonable plan participant could not read the SPD and know with any degree of certainty," which "conflicting inference" should control, the SPD is ambiguous. <u>See</u> <u>Thomason</u>, 703 Fed. Appx. at 252. Because this language is ambiguous, it must be construed against Standard and in favor of Chavez. <u>See</u> <u>id</u>. at 251.

**2.** **<u>Rotator Cuff Torn So Badly that Subscapularis and Infraspinatus Tendons Are Not Repairable, and Ruptured Biceps Tendon, Are Not "Sprains or Strains of Joints or Muscles</u>."**

219. The use of "sprains or strains of joints or muscles" in the definition of "Other Limited Conditions" in the SPD does not include the massive injury to Chavez's right shoulder, involving a rotator cuff torn so badly that the subscapularis and infraspinatus tendons were not repairable, and a biceps tendon that was ruptured and left a "stump." Frankly, <u>nobody</u> but Standard would consider a completely severed or ruptured tendon to constitute a "sprain" or "strain." That interpretation is as absurd as considering a heart attack to constituting a muscle cramp.

220. In any event, because a "reasonable plan participant" could not read the SPD and "know with any degree of certainty" which "conflicting inference" should control, the SPD is, at a minimum, ambiguous. <u>See</u> <u>Thomason</u>, 703 Fed. Appx. at 252. As a result, it must be construed against Standard and in favor of Chavez. <u>See</u> <u>id</u>. at 251.

STANDARD FLAGRANTLY FAILED TO PROVIDE A "FULL AND FAIR REVIEW"

A. **Legal Principles Governing Full and Fair Review of Claims**.

   1. **Fiduciary Duty**.

221. In ERISA cases, fiduciaries are those with "any discretionary authority or discretionary responsibility in the administration" of the ERISA plan.  29 U.S.C. § 1002(21)(A).  A fundamental duty of a fiduciary is a duty of loyalty to the beneficiaries.  "ERISA's duty of loyalty is 'the highest known to the law.'"  Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 294 (5th Cir. 2000).

222. The United States Supreme Court explained:

> ERISA imposes higher-than-marketplace quality standards
> . . . .  It sets forth a special standard of care upon a
> plan administrator, namely, that the administrator
> "discharge [its] duties" in respect to discretionary
> claims processing "solely in the interests of the
> participants and beneficiaries" of the plan.

Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 115 (2008) (citations omitted).

223. The United States Supreme Court has emphasized one type of conduct that would violate the fiduciary duty of loyalty: "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'"  Varity Corp. v. Howe, 516 U.S. 489, 506 (1996).

   2. "**Full and Fair Review**" by the Fiduciary.

224. A fundamental requirement under ERISA is a "full and fair review by the appropriate named fiduciary."  29 U.S.C. § 1133(2).

Such "full and fair review" must be in "accordance with regulations of the Secretary [of Labor]." Id. "Every employee benefit plan shall establish and maintain reasonable claim procedures." 29 C.F.R. § 2560.503-1(b). Claim procedures must not be "administered in a way" that "unduly inhibits or hampers the initiation or processing of a claim." 29 C.F.R. § 2560.503-1(b)(3); see Koehler v. Aetna Health, Inc., 683 F.3d 182, 191 (5th Cir. 2012).

225. ERISA's fiduciary standard of care "simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials." Glenn, 554 U.S. at 115. The Supreme Court found that facts demonstrating "procedural unreasonableness" may be significant on the question of whether ERISA benefits have been improperly denied. Id. at 118.

226. Procedural unreasonableness can extend to the plan administrator's assembly of the administrative record, which is critical importance in an ERISA lawsuit. The Fifth Circuit has made clear that "with respect to material factual determinations — those that resolve factual controversies related to the merits of the claim — the court may not consider evidence that is not part of the administrative record." Vega v. National Life Ins. Servs., Inc., 188 F.3d 287, 300 (5th Cir. 1999)(en banc).

227. Plan administrators know this limitation; many claimants do not. The en banc Fifth Circuit accordingly expressed its "concern that a self-interested administrator can manipulate this

<u>process unfairly</u> (e.g., by permitting the administrator <u>to exclude</u> <u>from the record information that would weigh in favor of granting</u> <u>the claim</u>)." <u>Id</u>. (emphasis added).

228. ERISA imposes numerous procedural requirements to protect claimants. A fiduciary's adherence to those procedural requirements "is especially not a lot to ask in return for the protection [of insurers] afforded by ERISA's preemption of state law causes of action – causes of action which threaten considerably greater liability than that allowed by ERISA." <u>See Hansen v.</u> <u>Continental Ins. Co.</u>, 940 F.2d 971, 982 (5th Cir. 1991). Preemption of Texas "bad faith" law, <u>see id</u>. at 979, cannot be seen as an invitation for insurers like Standard to manipulate the claim process to favor the denial of benefits.

### 3.   <u>Substantive Remedy for Procedural Violations</u>.

229. The Fifth Circuit has expressed wariness of procedural violations as a means of "sandbagging" the claimant. <u>See LaFleur</u> <u>v. Louisiana Health Serv. & Indem. Co.</u>, 563 F.3d 148, 160 (5th Cir. 2009). A failure to provide the necessary "full and fair review" can be so egregious, therefore, that it may serve as an independent basis to overturn a denial of benefits and to award those benefits. <u>See id</u>.

230. The Fifth Circuit noted that the general rule is that procedural violations do not warrant a substantive remedy. <u>LaFleur</u>, 563 F.3d at 157. An exception to the rule applies when "the record establishes that the administrator's denial was an abuse of discretion as a matter of law." <u>Id</u>. at 158 (citation

omitted). The court also noted that a remand was unnecessary when "the case is so clear cut that it would be unreasonable for the plan administrator to deny the application of benefits on any ground." LaFleur, 563 F.3d at 158 (citation omitted).

231. The substantive remedy must be determined on a "case-by-case basis." LaFleur, 563 F.3d at 158 (citing Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 397, 397 n.5 (5th Cir. 2006)). In particular, the Fifth Circuit concluded in Robinson "both that Aetna failed to substantially comply with ERISA procedures and that Aetna abused its discretion by terminating Robinson's benefits." Robinson, 443 F.3d at 397. The court accordingly decided to "reject Aetna's suggestion that remand to the administrator is required." Id. at 397 n.5.

232. The Fifth Circuit also cited as "persuasive precedent" another case involving "egregious facts." LaFleur, 563 F.3d at 160 (citing Bard v. Boston Shipping Ass'n, 471 F.3d 229, 246 (1st Cir, 2006)). In Bard, the court found that the same people who denied the LTD claim also denied the appeal from their own denial. 471 F.3d at 240. That was a violation of the ERISA regulations, 29 C.F.R. § 2560.503-1(h)(3)(ii), (h)(4). 471 F.3d at 240. "Bard was thus deprived of a fully objective review of his benefits denial." Id.

233. In Bard, the court decided that "a remand is not appropriate here." Id. at 246. Significantly, the court noted that "here the remaining evidence compels the conclusion that Bard is entitled to benefits." Id. Moreover, "the delay in this case

vastly exceeded the time limits that ERISA imposes." <u>Id</u>.   The court accordingly instructed the district court to enter judgment ordering the payment of past-due benefits and any applicable interest. <u>Id</u>.   In contrast to <u>Bard</u>, the court in <u>LaFleur</u> found that, "[a]lthough Blue Cross failed to substantially comply with the procedural requirements of ERISA, these violations were not flagrant." 563 F.3d at 159.

234. In a more recent case, the Fifth Circuit held that an insurer failed to comply with procedural requirements and to provide a "full and fair review." <u>White v. Life Ins. Co. of N. Am.</u>, 892 F.3d 762, 769-70, 770 n.2. (5th Cir. 2018).   The court reversed the district court, and remanded for entry of judgment in the claimant's favor. <u>Id</u>. at 771.

235. As discussed below, Standard's procedural violations in this case have been more flagrant than those in <u>LaFleur</u>, and even more than in <u>Bard</u>.   The Court may accordingly enter judgment ordering the payment of all past-due benefits, and prejudgment interest, to the date of judgment. <u>See</u> <u>Bard</u>, 471 F.3d at 246; <u>see also</u> <u>White</u>, 892 F.3d at 771.

**B.** **<u>Standard Abdicated Its Fiduciary Duty to Provide a "Full and Fair Review</u>".**

236. Rather than discharge its fiduciary duties "solely" in the interest of beneficiaries such as Chavez, Standard abdicated its fiduciary duty of "accurate claims processing" through the required "full and fair review." <u>Glenn</u>, 554 U.S. at 115. Standard's claim procedures were "administered in a way" that "unduly inhibit[ed] or hamper[ed] the . . . processing" of Chavez's

claim, in violation of 29 C.F.R. § 2560.503-1(b)(3).  See Koehler, 683 F.3d at 191.  Indeed, Standard has been "sandbagging" Chavez to the extreme.  See LaFleur, 563 F.3d at 160.  As in White, Standard's failure to comply with procedural requirements and to provide a "full and fair review" should result in a judgment against it.  See White, 892 F.3d at 769-70, 770 n.2, 771. Discussed below are just some non-exclusive examples of Standard's flagrant and egregious procedural infractions.

1.   **Standard's Willful Blindness in a Rush to Deny Claim the Day Before Surgery on Chavez's Massive Shoulder Injury.**

237. The hospital records that Chavez provided to Standard on February 28, 2018 revealed that Chavez was scheduled for rotator cuff surgery on March 27, 2018.  Chavez also informed Standard by telephone on March 19, 2018 that his surgery was scheduled for March 27, 2018.  The operative note for that surgery described the rotator cuff tears in Chavez's right shoulder as "massive" and the damage to his biceps tendon as a "rupture."  A "rupture" is not a sprain or strain.

238. Yet Standard did not wait to see the operative note. Just one day earlier, the envelope containing Standard's denial letter dated "March 23, 2018" was postage-metered with the date of "03/26/18."  That postage-meter date was the same date that Marshall had noted, from a telephone conference with Chavez on February 28, 2018, that Chavez's shoulder surgery "is scheduled for 3/26/18."  Coincidence?  Chavez thinks not.

239. Standard knew from the MRI that the "superior labrum cannot be evaluated due to the degree of motion artifact."  On

March 27, 2018, Dr. Webb observed that Chavez's biceps tendon was ruptured and retracted, with a "stump" that remained attached to the superior labrum. Dr. Webb was able to directly observe the that damage. Dr. Webb was also able to directly observe the "massive" rotator cuff damage that was not clear from the MRI on June 9, 2017, which was "limited due to motion artifact."

240. As the Supreme Court has noted, one may not "close his eyes, when he pleases, upon all sources of information, and then excuse his ignorance by saying that he does not see anything." Global-Tech Appliances, Inc. v, SEB S.A., 563 U.S. 764, 766 n.6 (2011)(discussing concept of "willful blindness"). At best, Standard's conduct constituted "willful blindness." As a matter of law, "willful blindness" does not satisfy the "higher-than-marketplace quality standards" that ERISA imposes. See Glenn, 554 U.S. at 115.

241. Instead, Standard's "willful blindness" demonstrates that Standard's claim procedures were "administered in a way" that "unduly inhibits or hampers the initiation or processing" of Chavez's claim, in violation of 29 C.F.R. § 2560.503-1(b)(3). See Koehler, 683 F.3d at 191. Standard's conduct also demonstrates "procedural unreasonableness," see Glenn, 554 U.S. at 118, and "smacks of bad faith," see Koehler, 683 F.3d at 191. Indeed, Standard was "sandbagging" Chavez to the extreme. See LaFleur, 563 F.3d at 160.

242. Furthermore, Standard compounded its willful blindness by improperly manipulating the administrative record. See Vega, 188

F.3d at 300.  If Standard felt secure in its denial, it would have dated the denial letter with the date it was mailed, March 26, 2018, rather than trying to hide that fact with the artificial "March 23, 2018" date.  This sort of "gamesmanship" by Standard is "inconsistent with the mandate of 29 U.S.C. § 1133" for a "full and fair review."  See Wilczynski v. Lumbermens Mut. Cas. Co., 93 F.3d 397, 403 (7th Cir. 1996).

## 2. Standard's Procedural Unreasonableness in Ignoring Evidence Chavez Submitted on June 13, 2018.

243. Especially egregious was Standard's decision in "declining" to review Chavez's submission of June 13, 2018. Chavez's June 13 letter quoted at length the en banc Fifth Circuit's decision in Vega, under which such submissions became part of the administrative record.  In the face of Vega, Standard's refusal to consider those records was unconscionable.

## 3. Standard's Procedural Unreasonableness in Using Its Consultant, Dr. Volk, as a Pretext to Deny the Claim.

244. Unfortunately, it is not an uncommon fact pattern that insurers use experts as a pretext to justify the denial of a claim. That pattern does not depend on the underlying legal basis of claim.  Under Texas law, the Texas Supreme Court observed that "we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law."  State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 448 (Tex. 1997).  (Complaint at 24 ¶ 164.)

> Instead, we have repeatedly acknowledged that an insurer's reliance upon an expert's report, standing alone, will not necessarily shield the carrier if there is evidence that the report was not objectively prepared

> or the insurer's reliance on the report was unreasonable.
> . . .
>
> . . .
>
>     In this case, the [plaintiffs] presented evidence
> from which a fact-finder could logically infer that [the
> expert's] reports were not objectively prepared, that
> [the insurer] was aware of [the expert's] lack of
> objectivity, and that [the insurer's] reliance on the
> reports was merely pretextual.  Accordingly, there is
> some evidence that [the insurer] denied the claim without
> a reasonable basis or without attempting to objectively
> determine whether its liability had become reasonably
> clear.

Id.

245. Such pretexts are not theoretical in the context of claims for disability insurance benefits under ERISA.  For example, a Dr. McSharry "was one of several medical advisors employed by [UnumProvident] for the purpose of enabling it to make medical judgments regarding the disability status of claimants." McSharry v. UnumProvident Corp., 237 F. Supp. 2d 875, 877 (E.D. Tenn. 2002). According to Dr. McSharry, UnumProvident "encouraged medical advisors to use language in their reports that could support the denial of disability insurance claims." Id.

246. Under ERISA, the question of whether an expert's "report was not objectively prepared or the insurer's reliance on the report was unreasonable" is also relevant, but under differently-worded standards.  Again, under ERISA, every employee benefit plan "shall establish and maintain reasonable claim procedures." 29 C.F.R. § 2560.503-1(b).  Claim procedures must not be "administered in a way" that "unduly inhibits or hampers the initiation or processing of a claim." 29 C.F.R. § 2560.503-1(b)(3); see Koehler,

683 F.3d at 191 (unreasonable claim procedures can serve as evidence of bad faith).  Again, facts demonstrating "procedural unreasonableness" may be significant on the question of whether ERISA benefits have been improperly denied.  Glenn, 554 U.S. at 118.

247. The report of Standard's consultant, Dr. Volk, does not support Standard's denial.  Dr. Volk ignored the severity of the problems with Chavez's right wrist, as further discussed below.  Dr. Volk's opinion that the "massive" damage to Chavez's right shoulder, or at least the damage to his rotator cuff, "falls under 'sprains or strains of joints or muscles'" is so ludicrous as to demonstrate Standard use of his opinion as a pretext.  Moreover, Dr. Volk did not opine that a ruptured biceps tendon was a "sprain or strain," yet Standard simply ignored that fact in its race to deny Chavez's claim before his shoulder surgery.

### STANDARD'S DENIAL IS NOT SUPPORTED BY CONCRETE EVIDENCE, AND LACKS A RATIONAL CONNECTION TO THE EVIDENCE

**A.  Requirements for Concrete Evidence, in Light of All the Evidence, and a Rational Connection Between Evidence and Denial**

248. Factual determinations in ERISA cases are reviewed for an abuse of discretion.  As discussed below, factual determinations are reviewed in light of all the evidence in the administrative record (and not merely on the evidence that supports a denial) to determine if the denial is supported by "concrete evidence."  Under that standard, pain cannot be ignored.  Moreover, factual determinations are reviewed to determine whether there is a "rational connection" between the evidence and the denial.  The

"rational connection" requirement applies as well to the opinions of medical consultants.

### 1.  __Necessity for Concrete Evidence, Rather than Suspicion__.

249. "Without some <u>concrete evidence</u> in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion." <u>Vega v. National Life Ins. Servs., Inc.</u>, 188 F.3d 287, 302 (5th Cir. 1999)(<u>en banc</u>, emphasis added).  Significantly, the <u>Vega</u> decision clearly requires that a denial be "based on evidence," <u>id</u>. at 299, and does not authorize a denial to be based on a lack of evidence.  A plan administrator cannot properly deny a claim unless it has first gathered evidence that "clearly supports the basis for its denial."  <u>Id</u>. at 299, 299 n.9.  Evidence that is "simply ambiguous" is insufficient to support the denial of an ERISA claim.  <u>Id</u>. at 301.

> Plainly put, we will not countenance a denial of a claim solely because an administrator suspects something may be awry.  Although we owe deference to an administrator's reasoned decision, <u>we owe no deference to the administrator's unsupported suspicions</u>.

<u>Id</u>. at 302 (emphasis added).

250. Conclusory opinions by the administrator, therefore, are "insufficient to carry its burden." <u>LaFleur</u>, 563 F.3d at 160 n.27. If the administrator does not defer to the opinions of the treating physicians, "then it must specifically identify other medical evidence that supports its determination." <u>See id</u>.

### 2.  __Use of Entire Administrative Record for Review of Factual Determinations, Including Evidence of Pain__.

251. As the Supreme Court stated in an ERISA case, a plan administrator "may not arbitrarily refuse to credit a claimant's

reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). The judicial review of a denial of benefits under ERISA accordingly includes a review of the "quality and quantity of the medical evidence in the opinions on both sides of the issues." McDonald v. Western-So. Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003).

> Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan [administrator] was able to find a single piece of evidence—no matter how obscure or untrustworthy—to support a denial of a claim for ERISA benefits.

Id. The adequacy of the denial must be determined "solely by reference to the administrative record," and "in light of the administrative record as a whole." Moon v. Unum Provident Corp., 405 F.3d 373, 381 (6th Cir. 2005) (emphasis added). Whether the administrative record contains substantial evidence to support a denial must be considered "in the light of all the evidence." Corry v. Liberty Life Assurance Co., 499 F.3d 389, 399 (5th Cir. 2007)(emphasis added).

252. In determining whether a denial is supported by concrete evidence in light of all the evidence in the administrative record, pain cannot be ignored. It is an abuse of discretion to "focus on the tests, rather than the pain and its effect," since "pains cannot be clinically measured by tests." Lain v. UNUM Life Ins. Co., 279 F.3d 337, 347 (5th Cir. 2002). As the Fifth Circuit recognized, it is an abuse of discretion for a plan administrator to rely on snippets of evidence taken out of context, or to equate certain limited casual activities with the kind of daily

performance required at work, or to focus on certain "normal" test results while ignoring abnormal results.  Id.  The Fifth Circuit in Lain accordingly affirmed an award of disability benefits "because there is a complete absence in the record of any 'concrete evidence' supporting UNUM's determination that [the plaintiff] is not disabled."  Id. at 347.

### 3.   Necessity for Rational Connection Between Evidence and Denial, Including Opinions of Medical Consultants.

253. A denial of benefits constitutes an abuse of discretion if "made without a rational connection between the known facts and the decision or between the found facts and the evidence." Bellaire Gen. Hosp. v. Blue Cross Blue Shield, 97 F.3d 822, 828 (5th Cir. 1996)(emphasis added).   Unfortunately, plan administrators are known to deny claims on the basis of a medical consultant's opinion, despite the lack of a rational connection between the evidence and the opinion or between the opinion and the denial.  This point is illustrated by many cases decided by the Fifth Circuit in which disability claims were improperly denied in reliance upon a consultant's opinions that lacked the necessary rational connection to the evidence.

254. For example, the Fifth Circuit emphasized that a plan administrator may not arbitrarily refuse to credit reliable evidence, or to effectively ignore it.  Schully v. Continental Cas. Co., 380 Fed. Appx. 437, 439 (5th Cir. 2010).   "Nor may an administrator rely on an . . . opinion without considering its basis or whether, as was the case here, it is in plain conflict with the . . . records."  Id.  The Fifth Circuit agreed with the

district court, that Hartford "deliberately ignored" Mr. Schully's evidence in order to support its "preferential and predetermined conclusions." Id.

255. The Fifth Circuit was critical of a denial of benefits in Alexander v. Hartford Life & Accident Ins. Co., 347 Fed. Appx. 123 (5th Cir. 2009).[3]  The insurer relied upon its hired consultant (Dr. Roaf) to "misstate" the results of an examination.  Id. at 125-26.  The Fifth Circuit found that there was "no rational connection between the known information and the conclusion on this important issue."  Id. at 126; see also Franklin v. AT&T Corp., 2010 WL 669762, at *6 (N.D. Tex. Feb. 24, 2010)(citing Alexander).

256. The Fifth Circuit affirmed a judgment that an insurer abused its discretion in terminating benefits in Bray v. Fort Dearborn Life Ins. Co., 312 Fed. Appx. 714 (5th Cir. 2009).[4]  The court explained:

> [T]he opinions of [the insurer's] consulting physicians are not "substantial evidence" supporting the denial of benefits . . . .  Moreover, evidence from Bray's treating physicians established the existence of an objective condition that could cause the pain of which Bray complained.

Id. at 715-16 (emphasis added).

257. The Fifth Circuit vacated a summary judgment in favor of an ERISA plan that had denied disability benefits and remanded for entry of judgment in favor of the claimant in Bernardo v. American Airlines Inc., Long Term Disability Plan, 297 Fed. Appx. 342 (5th

---

[3] The undersigned represented the claimant in Alexander.

[4] The undersigned represented the claimant in Bray.

Cir. 2008). The court reviewed the plan's denial letter and the report of its consultant, Dr. Chao, and stated that "these conclusions do not reflect a rational connection between the known facts and the decision to deny benefits." Id. at 346. The court noted that the claimant's symptoms were detailed in the records from her treating physicians. Id. "Significantly, Dr. Chao does not purport to explain why the severe symptoms found by [the treating physicians] were not disabling." Id. at 346-47. The court found "an unexplained gap" between the treating physicians' finding of disability and "the conclusory report of Dr. Chao, who found no disability." Id. at 347 (emphasis added). The court found "no evidence in the record that Dr. Chao considered" certain evidence, except for Dr. Chao's "speculation." Id. The court found that such "speculation" constituted "no evidence that contradicts the treating physicians' conclusion" of total disability. Id.

258. The Fifth Circuit noted that the denial of benefits was based on a report from a consultant, Dr. Polsky. Martin v. SBC Disability Income Plan, 257 Fed. Appx. 751, 754 (5th Cir. 2007). The court concluded that Dr. Polsky's conclusions "do not reflect a rational connection between the known facts and the decision to deny benefits." Id. The court held that the plan "did not reasonably and appropriately rely on Dr. Polsky's report because it clearly did not accurately reflect the facts in Martin's medical record." Id. at 755. The court concluded that neither the administrator nor its consultant presented any evidence "that

contradicts the treating physician's conclusion." <u>Id</u>.  The court
concluded that the denial of benefits was an abuse of discretion,
and that the trial court erred in granting summary judgment in
favor of the plan.  <u>Id</u>.

**B.    <u>Standard Ignored the Requirement for "Concrete Evidence</u>."**

259. Chavez has submitted abundant evidence of his
disabilities.  In contrast, the administrative record contains no
"concrete evidence" that would be needed for Standard's denial to
be upheld.  <u>See</u> <u>Vega</u>, 188 F.3d at 297.  Standard failed to satisfy
the requirement that a denial must be "based on evidence," <u>see</u> <u>id</u>.
at 299, and that a claim cannot properly be denied without evidence
that "clearly supports the basis for its denial," <u>see</u> <u>id</u>. at 299,
299 n.9.  Whatever Standard's "suspicions" may be, they are
"unsupported," and the Court owes them "no deference."  <u>See</u> <u>id</u>. at
302.

260. Standard's conclusory opinions are "insufficient to carry
its burden."  <u>LaFleur</u>, 563 F.3d at 160 n. 27.  If Standard did not
defer to the opinions of Chavez's treating physicians, "then it
must specifically identify other medical evidence that supports its
determination."  <u>See</u> <u>id</u>.  Standard failed to do so.

**C.    <u>The Report of Standard's Consultant, Dr. Volk, Lacks a
Rational Connection to the Evidence</u>.**

261. Chavez provided Standard with abundant evidence
concerning Chavez's disabilities and the sources and treatments
thereof.  Standard "deliberately ignored" Chavez's evidence in
order to support its "preferential and predetermined conclusions."
<u>See</u> <u>Schully</u>, 380 Fed. Appx. at 439.

262. In his report, Dr. Volk referred to Chavez's "[r]ight hand stiffness after arthrodesis surgery," but utterly failed to address the staph infection in Chavez's right wrist, or the osteomyelitis of Chavez's right hand, or the septic arthritis of Chavez's right wrist, the removal of the scaphoid bone from Chavez's right wrist, or the removal of the styloid process from the right radius within Chavez's right wrist, or the removal of a considerable amount of articular cartilage from the midcarpal joint of Chavez's right wrist, or the fusion of the midcarpal joint within Chavez's right wrist with three screws and a bone graft, or the absence of bony union between the triquetrum and lunate bones and between the capitate and hamate bones of Chavez's right wrist. Dr. Volk completely ignored Dr. Berg's assessment that Chavez had "no good function" of his right hand.

263. "Significantly, Dr. [Volk] does not purport to explain why the severe symptoms found by [the treating physicians] were not disabling." See Bernardo, 297 Fed. Appx. at 346-47. There is "an unexplained gap" between the finding of disability by Dr. berg and "the conclusory report of Dr. [Volk], who found no disability." See id. at 347 (emphasis added). Neither Dr. Volk nor Standard presented any evidence "that contradicts [Dr. Berg's] conclusion." Martin, 257 Fed. Appx. at 755.

264. Not only is there is "no evidence in the record that Dr. [Volk] considered" Dr. Berg's assessment, see Bernardo, 297 Fed. Appx. at 47, Dr. Volk's report contradicts the report from Standard's first consultant, Dr. Mandiberg. Dr. Mandiberg opined

that the capacity to "lift, carry, and push or pull a maximum of 10 pounds occasionally," as noted in a Medical Questionnaire, "may very well be permanent."  Moreover, that capacity is below the "Medium" strength rating of Chavez's occupation.  There is "no rational connection between the known information and the conclusion on this important issue."  See Alexander, 347 Fed. Appx. at 125-26.

265. The "evidence from [Chavez's] treating physicians established the existence of an objective condition that could cause the pain of which [Chavez] complained."  See Bray, 312 Fed. Appx. at 715-16 (emphasis added).  Neither Dr. Volk nor Standard challenged the existence of Chavez's pain, but failed to explain why he was supposedly able to work regardless.  "[T]he opinions of [Standard's consultant] are not 'substantial evidence' supporting the denial of benefits."  See id.

266. As for Dr. Volk's opinions regarding the "massive" damage to Chavez's shoulder, there is no rational connection between the extent of that damage and Dr. Volk's opinion that: "Right shoulder rotator cuff tear falls under 'sprains or strains of joints or muscles'."  Moreover, Dr. Volk did not opine that a ruptured biceps tendon was a "sprain or strain."

### STANDARD YIELDED TO ITS CONFLICT OF INTEREST

**A.** **Conflict of Interest Is a Factor, and Can Be a Tiebreaker, in the Judicial Review of a Claim Denial**.

267. The Supreme Court addressed in Glenn the questions of what constitutes a conflict of interest, and how the conflict should be taken into account, in ERISA lawsuits involving a denial

of benefits.  Both questions are discussed below.

268. In Glenn, MetLife raised only the question of whether it operated under a conflict of interest in both evaluating and paying claims.  554 U.S. at 110.  The Supreme Court held that a conflict of interest exists when benefits are denied either by a self-funded employer or by an insurer.  Id. at 112.  The court observed that "every dollar provided in benefits is a dollar spent by . . . the employer; and every  dollar saved . . . is a dollar in [the employer's] pocket."  Id. (citation omitted).  "[T]he employer's own conflict may extend to its selection of an insurance company to administer its plan."  Id. at 114.

269. The Fifth Circuit addressed the conflict of interest issue very recently.  The court stated: "When, as here, the insurer of the plan also determines whether the claimant is entitled to benefits, a conflict of interest arises."  White, 892 F.3d at 767 (citing Glenn).

270. As amicus, the Solicitor General asked the Supreme Court in Glenn to consider how any such conflict should be taken into account during a judicial review.  554 U.S. at 110.  The Court specifically declined to adopt "a one-size-fits-all procedural system."  Id. at 116.  Instead, the Court emphasized that a conflict of interest is one of several considerations included in the judicial review of benefit denials.  Id. at 117.  The Court emphasized that the importance of a conflict of interest would depend upon the facts of each case:

> The conflict of interest at issue here, for example,
> should prove more important (perhaps of great importance)

> where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.

Id. Because the conflict must be weighed as one factor in the judicial consideration of whether a plan administrator has abused its discretion, id. at 115, the Court specifically held that "any one factor will act as a tiebreaker when the other factors are closely balanced." Id. at 117 (emphasis added).

271. The Supreme Court's discussion of the specific facts in the Glenn case provides guidance on at least some factual situations that provide more weight to the conflict-of-interest factor. For example, facts demonstrating "procedural unreasonableness" may be important in their own right, but also justify the court in "giving more weight to the conflict." Id. at 118. The Supreme Court found nothing improper in the way that the Sixth Circuit weighed evidence that the insurer emphasized a single medical report that favored a denial of benefits, and deemphasized other contrary reports, and "failed to provide its independent vocational and medical experts with all of the relevant evidence." Id. at 118.

272. Also considered are circumstances "where an insurance company administrator has a history of biased claims administration." Id. at 117. On the issue of "biased claims administration," the Supreme Court cited as an example a law review article discussing the Unum/Provident scandal. Glenn, 554 U.S. at 117; see John H. Langbein, Trust Law as Regulatory Law: The

Unum/Provident Scandal and Judicial Review of Benefit Denials Under
ERISA, 101 Nw. U. L. Rev. 1315, 1317-21 (2007).  The article, in
turn, gave as an example of claims that were "the most vulnerable"
to pressure for "bad faith termination" those claims involving "so-
called subjective illnesses, illnesses that don't show up on x-rays
or MRIs, like . . . chronic pain."  Id. at 1319.

273. The Unum/Provident scandal resulted in corrective action
by the Department of Labor and a number of state regulators.

> The examiners found several areas of concern, including
> excessive reliance upon in-house medical professionals,
> unfair construction of attending physician or independent
> medical exam reports, failure to evaluate the totality of
> the claimant's medical condition, and inappropriate
> burdens placed on claimants to justify their eligibility
> for benefits.

Wakkinen v. Unum Life Ins. Co., 531 F.3d 575, 582 (8th Cir. 2008).

**B.   Standard's Procedural Unreasonableness and Bias Display Its
Conflict.**

274. Standard is operating under a conflict of interest
because it  would retain for its own use any premiums received in
excess of benefits paid to claimants under its insurance policy.
Every dollar provided in benefits is a dollar spent by Standard,
and every dollar saved is a dollar in Standard's pocket.  See
Glenn, 554 U.S. at 114.  Standard's handling of Chavez's claim
shows that Standard's conflict of interest has adversely affected
its conduct.

275. Discussed above are just some non-exclusive examples of
Standard's "procedural unreasonableness" over the course of
Chavez's claim.  Glenn, 554 U.S. at 117.  Such "procedural
unreasonableness" justifies this Court in "giving more weight to

the conflict." Id. at 118.

276. Indeed, Standard's refusal to consider the medical records Chavez submitted on June 13, 2018 is particularly telling. Standard's refusal, "which coincides with [Standard's] self-interest, suggests procedural unreasonableness and empowers the court to accord more weight to [Standard's] structural conflict of interest." See Mercer v. Life Ins. Co. of N. Am., 874 F. Supp. 2d 610, 631 (W.D. La. 2012).

277. Standard has engaged in the same type of activity as was involved in the Unum/Provident scandal, including "unfair construction of attending physician . . . reports, failure to evaluate the totality of the claimant's medical condition, and inappropriate burdens placed on claimants to justify their eligibility for benefits." See Wakkinen, 531 F.3d at 582. Chavez's claim, based on "chronic pain," is among those claims that were then, and are now with Standard, subject to "bad faith termination." See Langbein, 101 Nw. U. L. Rev. at 1319. So pervasive have been Standard's improper activities that its conflict of interest clearly influenced its decision, so should be given more weight.

### RELIEF REQUESTED

278. Standard abused its discretion in denying Chavez's claim. Under 29 U.S.C. § 1132(a)(1)(B), Standard's denial should accordingly be overturned, and Standard should be ordered to pay all of Chavez's accrued LTD benefits at the rate of $1,868.40 per month from February 13, 2018 to the date of judgment under 29

U.S.C. § 1132(a)(1)(B), plus prejudgment interest at 5% per annum, and clarification that he has a right to LTD benefits in the future for so long as he meets plan requirements.

WHEREFORE, PREMISES CONSIDERED, Chavez prays that he recover from Standard all LTD benefits accrued through the date of judgment, plus reasonable attorney's fees and expenses, plus prejudgment and postjudgment interest at the maximum legal rates, and all costs of court, and for such other relief to which he may be entitled.

Respectfully submitted,

/s/ James L. Johnson
James L. Johnson
Texas Bar No. 10742020

THE JOHNSON LAW FIRM
10935 Estate Lane, Suite 268
Dallas, Texas 75238
Telephone:    214/363-1629
Telecopier:   214/363-9173
Email:
james@jamesljohnsondallasattorney.com

ATTORNEY FOR PLAINTIFF
JOSE CHAVEZ